UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------X

UNITED STATES OF AMERICA,

    – against –

CHASTITY HAWKINS,

                 Defendant.

--------------------------------------------------------X

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT, E.D.N.Y.

★ AUG 0 9 2005 ★

BROOKLYN OFFICE

MEMORANDUM, ORDER
& JUDGMENT
02-CR-563 (JBW)

APPEARANCES:

For the Government:

Roslynn R. Mauskopf
United States Attorney
Eastern District of New York
One Pierrepont Plaza
14th Floor
Brooklyn, New York 11201
By: Debra D. Newman, Assistant United States Attorney

For the Defendant:

Daniel Nobel
401 Broadway
25th Floor
New York, New York 10013

Jack B. Weinstein, Senior United States District Judge:

## Table of Contents

I. Introduction...................................................................................................................2

II. Facts and Procedural History........................................................................................3

    A. Crime.....................................................................................................................3

    B. Conviction and Sentence.......................................................................................4



  C. Offender Characteristics...................................................................................5

   1. Family and Community Ties.................................................................5

   2. Physical Condition................................................................................6

   3. Employment.........................................................................................6

  D. Downward Departure.......................................................................................6

  E. Appeal and Remand.........................................................................................7

  F. *Booker*.............................................................................................................7

III. Law.........................................................................................................................8

  A. Rehabilitation as an Aim of Sentencing.........................................................8

  B. Extraordinary Rehabilitation under the Sentencing Guidelines....................15

  C. Extraordinary Rehabilitation and Ordinary People......................................26

IV. Oral Conclusions at Hearing..................................................................................32

V. Post-Hearing Findings of Fact and Conclusions of Law.........................................40

  A. Findings of Fact.............................................................................................41

  B. Conclusions of Law.......................................................................................60

VI. Conclusion.............................................................................................................65

## I. Introduction

The government appealed from the district court's grant of a downward departure on the grounds of extraordinary rehabilitation. The United States Court of Appeals for the Second Circuit vacated the sentence and remanded the case for findings of fact.

It is the government's view that the defendant, a young mother, must be imprisoned. The court disagrees.

By a standard of clear and convincing evidence there has been extraordinary rehabilitation, both at the time of the original sentence and now. The fact that defendant engaged in further criminal activity while she was in the process of rehabilitation does not preclude a finding of extraordinary rehabilitation. *See, e.g.*, *United States v. Kane*, 88 F. Supp. 2d 408, 409 (E.D. Pa. 2000) (granting downward departure for drug trafficking conviction based on defendant's extraordinary rehabilitation despite the fact that "[w]hile under supervision of Pretrial Services, he tested positive for drug use several times . . . .").

After setting out the facts and procedural history (Part II), this memorandum addresses the law of rehabilitation under the Guidelines, section 3553(a) of title 18 of the United States Code, and general law (Part III); sets out this court's oral conclusions at the end of the hearing conducted pursuant to the remand (Part IV); makes findings of fact and law (Part V); and concludes that the facts and law support the original nonincarceratory sentence (Part VI).

## II. Facts and Procedural History

### A. Crime

The defendant was charged, along with approximately sixty others, in a scheme to defraud insurance companies by staging automobile accidents and initiating false legal and medical claims based on fabricated injuries.

The leader of the conspiracy was defendant's father, Quentin Hawkins. Beginning in January 1999, Mr. Hawkins led a city-wide organization devoted to staging car accidents with attendant fraudulent medical and legal claims. He organized the "accidents," directed the "victims" to medical clinics and personal injury lawyers, and obtained false police reports.

To aid in conducting the scheme, Quentin Hawkins employed several "lieutenants," who

were responsible for overseeing the events, including choosing locations for staged accidents, ensuring that the participants and vehicles were assembled, deciding whether the damage to the vehicles was sufficient, fabricating police reports, and coordinating referral of the "victims" to specific medical clinics and attorneys.

The defendant and one of her brothers, who are both children of the ringleader Quentin Hawkins, were directed by him to assist in arranging "accidents" by helping recruit participants. Their mother, Quentin's wife, also participated. It was a family business.

Following a November 1, 1999 staged accident, the defendant, along with other individuals, filed a mendacious personal injury lawsuit. On December 18, 2000, the defendant testified falsely that the accident was authentic.

B. Conviction and Sentence

Defendant pled guilty to a violation of section 371 of title 18 of the United States Code on May 28, 2002. There was no plea agreement. In her allocution defendant admitted to knowing participation in the November 1999 staged accident.

At the first sentencing hearing on October 3, 2002, the court adopted the loss calculation of $148,814.00 recommended by the government. That and other factual findings resulted in enhancements that increased the final offense level from a base of 6 to 13. Since defendant had had no prior brushes with the law, the applicable Guidelines sentencing range (Offense Level 13, Criminal History Category I), was 12 to 18 months.

Defense counsel moved for a downward departure on two grounds: extraordinary family circumstances and extraordinary rehabilitation. Decision was reserved. An adjournment of sentencing for one year was granted so that the defendant could have "a chance to show full

4

rehabilitation." During the interim, defendant was closely supervised by the court's Pretrial Services Agency.

The court received a positive evaluation from Pretrial Services regarding the defendant's successful efforts to maintain employment and on other aspects of her life. On September 15, 2003, a sentence principally of probation plus full restitution was imposed, based on a downward departure of five levels for extraordinary rehabilitation.

C. Offender Characteristics

At the September 2003 sentencing, the court was presented with a nuanced picture of the nature and circumstances of the offense and the history and characteristics of the offender.

1. Family and Community Ties

The defendant was born on May 7, 1975. She is one of four children of the marriage of Quentin Hawkins and Nancy Hawkins. At the time of defendant's sentence, Quentin Hawkins was incarcerated for his involvement in the scheme underlying defendant's conviction. His wife, her mother, was living with defendant, defendant's daughter, and defendant's thirteen-year-old brother.

Defendant was raised in a low-income area, in what pretrial services described as "lower-middle-income" circumstances. Her parents were recipients of Section 8 Housing Welfare Program benefits for approximately twelve years. Her father was an alcoholic.

After she dropped out of high school, defendant spent her time "hanging out" and partying. In 1996, unmarried, she gave birth to her daughter, Quentaya, who was six years old at the time of sentence. Quentaya's father has been almost steadily imprisoned since the child's birth.

5

At sentencing the defendant indicated that she did not know who would care for her daughter if she were incarcerated. Her mother, who had been largely responsible for the child, was depressed by her husband's incarceration and without an income.

2. Physical Condition

In 1993, when the defendant was seventeen years old, she was involved in a physical confrontation with a twenty-five year old woman. The woman, previously unknown to her, and for no apparent reason, threw acid at defendant, causing severe facial burns. Defendant was treated at the Cornell Burn Unit in New York City for the following three months. While she remains an attractive woman, she still bears deforming scars on her face and neck. She has also had a history of asthma and migraine headaches.

3. Employment

From September 2001 to October 2001, the defendant was employed by Lefta Check Cashing in Brooklyn, New York, as a teller. She was earning a gross income of $300.00 per week, before being fired for improperly approving two cashed checks. The manager of Lefta indicated that the defendant was responsible for approximately a $10,000.00 loss to the business. From October 2001 to January 2002 she received unemployment compensation and public assistance.

At the time of the 2003 sentence, the defendant had been employed for more than a year and a half as a console monitor for a security company in the Bronx at $11.65 an hour. Her duties included performing surveillance of apartment buildings to ensure residents' safety. Conviction resulted in her being discharged.

D. Downward Departure

As noted, at the September 2003 sentencing hearing Pretrial Services reported favorably on defendant's work, home life, and other indicia of rehabilitation. The court concluded that the defendant had displayed extraordinary rehabilitation under the Guidelines and, for that reason, granted a downward departure of five levels. An offense level of 8, criminal history category I, permitted a nonincarceratory probationary sentence. Imposed was a sentence principally of three years probation and restitution of $148,814.00.

E. Appeal and Remand

On appeal the government argued that the district court erred in departing downward on the ground of extraordinary rehabilitation.

Pursuant to what was then the recently enacted Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today Act of 2003, Pub. L. No. 108-21, 117 Stat. 650 (2003), the district court's downward departure was reviewed *de novo*. The United States Court of Appeals for the Second Circuit, concluded:

> [W]e must ascertain whether the defendant's rehabilitation is truly extraordinary. However, in the instant case, the district court failed to detail its reasons or factual basis for finding the defendant's rehabilitation to be extraordinary. As a result, we are unable to determine whether or not the district court erred in downwardly departing. Accordingly, we **VACATE** the district court's sentence and **REMAND** "for further development of the record so that the district court can make findings of fact as to the existence of [the defendant's] extraordinary rehabilitation."

Mandate, 03-1637 (emphasis in original) (citation omitted). The mandate was issued on March 2, 2005 and filed in the Clerk's Office of the Eastern District of New York on March 14, 2005.

F. *Booker*

Before the mandate was issued, the United States Supreme Court decided *United States v. Booker*, 125 S.Ct. 738 (Jan. 12, 2005). In addition to making the Sentencing Guidelines advisory

7

rather than mandatory, *Booker* invalidated the *de novo* standard of review set forth in Public Law Number 108-21. *See id.* at 765-66 ("In 2003, Congress . . . add[ed] a *de novo* standard of review for departures and insert[ed] cross-references to § 3553(b)(1). In light of today's holding, the reasons for these revisions – to make Guidelines sentencing even more mandatory than it had been – have ceased to be relevant. The pre-2003 text directed appellate courts to review sentences that reflected an applicable Guidelines range for correctness, but to review other sentences – those that fell 'outside the applicable Guideline range' – with a view toward determining whether such a sentence '*is unreasonable*, having regard for . . . the factors to be considered in imposing a sentence . . . .' In other words, the text told appellate courts to determine whether the sentence 'is unreasonable' with regard to § 3553(a). Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing. Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable.") (emphasis in original).

The mandate of the Court of Appeals did not reflect consideration of the decision of the Supreme Court in *Booker*, or its own decision on the procedural impact of *Booker* in *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Defense counsel reported seeking an amendment of the mandate from the Court of Appeals to reflect the sea change in sentencing law. No decision from the Court of Appeals on the effect of *Booker* having been received, out of concern for the rights and psychic well-being of the defendant over whom a potential prison term has been hanging for years, the court held the mandated hearing.

### III. Law

A. Rehabilitation as an Aim of Sentencing

The remand requires consideration of the following questions, among others: What is rehabilitation? Is the aim of rehabilitation to improve or restore? What makes rehabilitation "extraordinary"?

> The mysteries of the human condition are nowhere more apparent that in our criminal courts, where judges must struggle daily with remarkably profound and often unanswerable questions. What is the nature of good and evil? Why do people commit crimes? Why do we all, as David Hume once wrote, contain a particle of the dove next to elements of the wolf and the serpent? Why do the wolf and serpent prevail in some of us so often and so violently, yet in others of us so seldom and so mildly? Looming in the foreground is yet another profound question, one that has been the subject of jurisprudential debate, and great confusion, since the dawn of law: Why do we punish wrongdoers?
>
> . . . .
>
> Each of us hears conflicting and often inarticulate inner voices, one asserting that even the most contrite and reformed sinners must still pay some price for their sins, the other calling for mercy and forgiveness and asking us to empathize with the criminal. So it is not surprising that collectively we struggle to balance the form and amount of punishment that is appropriate, a struggle that lies at the heart of what we mean by "justice."

Morris B. Hoffman & Timothy H. Goldsmith, *The Biological Roots of Punishment*, 1 OHIO ST. J. CRIM. LAW 627, 627, 638 (2004).

These questions implicate the whole of sentencing theory and practice. Any decision concerning rehabilitation will necessarily be balanced by the statutory objectives of retribution, specific and general deterrence, as well as a consideration of the severity of the offense and the personal characteristics of the human being facing sentence. *See* 18 U.S.C. § 3553(a); *United States v. Blarek*, 7 F. Supp. 2d 192, 200 (E.D.N.Y. 1998) (discussing the philosophical principles underlying section 3553(a): "Ascertaining priorities among these potentially conflicting notions has long been a point of contention amongst legislators, scholars, jurists, and practitioners.

Somewhat oversimplifying, there are two basic camps. Retributivists contend that 'just deserts' are to be imposed for a crime committed. Utilitarians, in their various manifestations, suggest that penalties need to be viewed more globally by measuring their benefits against their costs. The debate between the desert justification and the various utilitarian justifications such as deterrence, incapacitation, and rehabilitation has continued to divide criminal law thinkers. Implied in this debate are questions about our basic values and beliefs[.]") (internal quotation omitted).

The retributive position "holds . . . that man is a responsible moral agent to whom rewards are due when he makes right moral choices and to whom punishment is due when he makes wrong ones." HERBERT L. PACKER, THE LIMITS OF THE CRIMINAL SANCTION 9 (1968); *see also* PETER FRENCH, THE VIRTUES OF VENGEANCE x (2001) ("It is fashionable to describe one's theory of punishment or justice as prohibiting revenge or as definitely not countenancing vengeance. Vengeance, we are usually assured . . . is impermissible. After all, bearing up under oppression and victimization, turning the other cheek, is the antithesis of revenge, and only G[*]d could be both pure enough and knowledgeable enough to administer vengeance in a morally fitting way. Leave it to heaven. Perhaps, but if G[*]d can play the part of the avenger, then vengeance cannot be all that bad. At least it cannot be evil per se to desire it or, perhaps, to engage in it. And what if there is no G[*]d or morally ordered universe, or if G[*]d has disengaged from the business of empowering morality?"); Chaim Povarsky, *Free Will and Intent in a Pressing Setting - Moral and Legal Responsibility: A Philosophical, Jewish and American Legal Perspective*, JEWISH LAW REPORT 7 (Dec. 2004) ("According to the Bible, human beings are the only creatures in the universe that were endowed with the power of choice, that is, the

ability to distinguish and choose between good and evil, right and wrong, just and unjust, fair and unfair. Animals do not have this power, but rather they act upon their instincts. Maimonides states: 'Free will is granted to all men. If one desires to turn himself to the path of good and be righteous, the choice is his. Should he desire to turn himself to the path of evil and be wicked, the choice is his.'").

"To the retributive view there has always been opposed one that we may characterize as utilitarian: it holds that the purpose of the criminal law is to prevent or reduce the incidence of behavior that is viewed as antisocial." PACKER, *supra*, at 11. *See also* MARKUS D. DUBBER AND MARK G. KELMAN, AMERICAN CRIMINAL LAW: CASES, STATUTES AND COMMENTS 1 (2005) ("Positive retributivism considers the offender's desert a necessary and a sufficient precondition of punishment; negative retributivism considers desert only a necessary precondition. Consequentialism comes in several varieties. 'Crime control' tends to be the end for the sake of which punishment is justified on consequentialist grounds. The various consequentialist theories differ on just how crime is to be prevented. Rehabilitation prevents crime by curing the offender of her abnormal criminal propensities, for her own and the community's sake. Incapacitation prevents the abnormally dangerous offender from committing crime, not by curing her, but by making it impossible for her (or at least limiting the circumstances in which she can) act on her tendencies. And deterrence prevents crime by scaring the offender away from future crime (specific deterrence) or by making an example of the offender to others, thus scaring them away from crime (general deterrence)."); MARTHA C. NUSSBAUM, HIDING FROM HUMANITY: DISGUST, SHAME, AND THE LAW 246 (2004) ("[W]hatever penalties we choose, our focus should be on the future, on reform and reintegration [into society].").

Section 3553(a) of title 18 of the United States Code, mandating consideration of the

personal characteristics of the person facing sentence and the need to consider rehabilitation,

invites a behavioral utilitarian approach:

> The [modified] behavioral position is considerably more complex
> than the retributive position. Its four principal bases can, however,
> be stated here. First, free will is [not absolute], because human
> conduct is [powerfully influenced] by forces that lie beyond the
> power of the individual to modify. Second, moral responsibility,
> accordingly, is [not absolute], because blame cannot be [clearly]
> ascribed for behavior that is [significantly] conditioned [by
> environmental forces]. Third, human conduct, being [somewhat]
> causally determined, can and should be scientifically studied and
> controlled. Fourth, the function of the criminal law should be
> purely and simply to bring into play processes for modifying the
> personality, and hence the behavior, of people who commit
> antisocial acts; or, if all else fails, to restrain them from committing
> offenses by the use of external compulsion (e.g., confinement).

PACKER, *supra*, at 12. *Cf. United States v. Blarek*, 7 F. Supp. 2d 192, 200 (E.D.N.Y. 1998) ("In

the nineteenth and most of the twentieth century American prison and punishment system

reforms were designed primarily to rehabilitate the prisoner as a protection against further

crime."); DOUGLAS G. MORRIS, JUSTICE IMPERILED 20-21 (2005) (discussing shifting emphasis

in Europe at the beginning of the twentieth century from "fitting the punishment to the crime

without regard to the person of the offender" to "modify[ing] the behavior of individuals to

prevent them from committing further crimes[, which] required attention to both the personality

and the environment of the individual.").

A rehabilitative design takes into account the fact that a person's actions may reflect

genetics, social advantage, and deprivation as well as free will, merit and culpability. In

evaluating how best to approach reformation of a defendant, some appreciation of the causes of

criminal behavior is desirable. The disadvantage, dysfunction, and toxicity of a defendant's development is substantially causative. The following excerpt provides a still fairly accurate narrative of variations in socioeconomic deprivation in New York City, reflected in crime statistics:

> The Number 6 train from Manhattan to the South Bronx makes nine stops in the 18-minute ride between East 59th Street and Brook Avenue. When you enter the train, you are in the seventh richest congressional district in the nation. When you leave, you are in the poorest.
>
> The 600,000 people who live here and the 450,000 people who live in Washington Heights and Harlem, which are separated from the South Bronx by a narrow river, make up one of the largest racially segregated concentrations of poor people in our nation.
>
> Brook Avenue, which is the tenth stop on the local, lies in the center of Mott Haven, whose 48,000 people are the poorest in the South Bronx. Two thirds are Hispanic, one third black. Thirty-five percent are children. In 1991, the median household income of the area, according to the *New York Times*, was $7,600.
>     . . . .
> Crack-cocaine addition and the intravenous use of heroin, which children I have met here call "the needle drug," are woven into the texture of existence in Mott Haven. Nearly 4,000 heroin injectors, many of whom are HIV-infected, live here. Virtually every child . . . knows someone, a relative or neighbor, who has died of AIDS, and most children know many others who are dying now of the disease. . . .
>
> Depression is common among children in Mott Haven. Many cry a great deal but cannot explain exactly why.
>
> Fear and anxiety are common. Many cannot sleep.
>
> Asthma is the most common illness among children here. Many have to struggle to take in a good deep breath. Some mothers keep oxygen tanks, which children describe as "breathing machines," next to their children's beds.
>     . . . .
> In humid summer weather, roaches crawl on virtually every surface of the houses in which many of the children live. Rats emerge from holes in bedroom walls, terrorizing infants in their cribs. . . .
>
> In speaking of rates of homicide in New York City

> neighborhoods, the *Times* refers to the streets around St. Ann's as "the deadliest blocks" in "the deadliest precinct" of the city. . . .
>
> In 1991, 84 people, more than half of whom were 21 or younger, were murdered in the precinct. A year later, ten people were shot dead on a street called Beekman Avenue . . . . On Valentine's Day of 1993, three more children and three adults were shot dead on the living room floor of an apartment six blocks from the run-down park that serves the area.
>
> In early July of 1993 . . . three more people were shot in 30 minutes in three unrelated murders in the South Bronx . . . . A week later, a mother was murdered and her baby wounded by a bullet in the stomach while they were standing on a South Bronx corner. Three weeks after that, a minister and elderly parishioner were shot outside the front door of their church, while another South Bronx resident was discovered in his bathtub with his head cut off. In subsequent days, a man was shot in both his eyes and a ten-year-old was critically wounded in the brain.
>
> What is it like for children to grow up here? What do they think the world has done to them? Do they believe that they are being shunned or hidden by society? If so, do they think that they deserve this? What is it that enables some of them to pray? When they pray, what do they say to G[*]d?

JONATHAN KOZOL, AMAZING GRACE 3-5 (Perennial ed. 2000). *See id.* at 143 ("Nearly three quarters of the inmates of state prisons in New York come from the same seven neighborhoods of New York City: the South Bronx, Harlem, Brownsville, Bedford-Stuyvesant, South Jamaica, East New York, and the Lower East Side of Manhattan.").

Non-socioeconomic elements of a defendant's personal history, such as, in the instant case, a dysfunctional family with a criminal father, a fagin, directing his children into crime, are also important in understanding the criminal conduct of a specific person and future prevention.

A rehabilitative framework is obviously in tension with a purely retributive or general deterrence model. It may be more likely that the person with a deprived background will fall into crime. Under a purely retributive or general deterrence model, a person whose identity has been

shaped by a poor environment through no fault of her own should be punished in the same manner and to the same extent as a person who has been afforded every privilege, wants for nothing, and turns her advantage to criminal efforts. Pure retribution, or "just deserts," ignores the handicapping effect of social, economic, and natural deprivation.

B. Extraordinary Rehabilitation under the Sentencing Guidelines

Courts have recognized that while the Federal Sentencing Guidelines are predicated primarily on mechanically defined "just deserts" based on the nature of the crime, "extraordinary rehabilitation" may entitle a defendant to a lesser sentence. *See, e.g.*, *United States v. Bryson*, 163 F.3d 742, 746 (2d Cir. 1998) ("The Sentencing Guidelines provide a framework applicable to a 'heartland' of typical cases embodying the conduct that a given guideline describes. A sentencing court dealing with an 'atypical' case, therefore, need not be rigidly constrained by the proscriptions of the Guidelines. . . . The Guidelines do not enumerate all of the factors that may individually or collectively render a case 'atypical.' . . . This Court has held that a sentencing judge may exercise discretion and depart from the applicable guideline range in light of a defendant's efforts toward rehabilitation, *provided those efforts are extraordinary*.") (emphasis added); *see also United States v. Rosado*, 254 F. Supp. 2d 316, 321 (S.D.N.Y. 2003) ("Since rehabilitation may not be a basis for incarceration but must be considered as a basis for sentencing, Congress must have anticipated that sentencing judges would use their authority, in appropriate cases, to reduce a defendant's sentence to permit him to continue his rehabilitation in the most effective manner.") (internal quotation omitted).

In considering the question of what constitutes "extraordinary rehabilitation," the Court of Appeals for the Second Circuit has held that the analysis of the "starting point" – depravity or

15

its lack at the time of the individual offender's criminal conduct – is required. *See, e.g., Bryson,*

163 F.3d at 748-49 ("Much depends on the baseline from which an individual's *extraordinary*

*rehabilitation* can be measured. The achievement of the ordinary responsibilities of citizenship,

such as regular employment and support of dependants may, depending on the starting point of

rehabilitation, be sufficient if that achievement is the product of substantial commitment

sustained over time.") (emphasis added). Pre-*Booker*, this "starting point" or baseline approach

under the Guidelines, as interpreted by the Court of Appeals, typically focused on the seriousness

of the criminal history rather than on the socioeconomic, psychological, and other characteristics

of the offender.

The cases in the Court of Appeals for this circuit cannot be satisfactorily synthesized

because, first, it is almost impossible to glean their subtleties from the opinions or even the full

records, second, there is some variation in the judges' empathy and experience, and, third, there

is an almost infinite variety of backgrounds among defendants. *See, e.g., United States v.*

*Normandeau,* No. 02-cr-1587, 63 Fed. Appx. 573, 574-75 (2d Cir. Apr. 28, 2003) (unpublished)

("In his pre-sentencing submission to the District Court, [the defendant] sought, *inter alia,* a

downward departure for *extraordinary rehabilitation.* In its reply, the government objected to

such a departure, arguing that [his] completion of a treatment program while incarcerated was not

extraordinary. At [defendant's sentencing hearing] Dr. Lisa Marsch, a psychologist with

expertise in the treatment of opiate addiction, testified at length about [defendant's] drug history .

. . .") (emphasis added). *But see United States v. Brady,* No. 04-cr-0729, 2005 WL 1706509 (2d

Cir. July 22, 2005) (approving in part a downward departure after a finding that defendant

suffered extraordinary childhood abuse that created a mental or emotional condition which

caused her to commit the crime of conviction); *United States v. Sherry*, No. 03-cr-1166, 107 Fed.

Appx. 253, 259 (2d Cir. Aug. 17, 2004) (unpublished) (affirming refusal to find rehabilitative

efforts extraordinary based in part on district court's finding that the criminal acts were

undertaken from a "starting place" of "reasonable middle-class circumstances," "good

education," "a supportive family," and "several good jobs.") (citation omitted), *vacated by* 125

S.Ct. 1677 (Mar. 21, 2005) (remanding "for further consideration in light of [*Booker*]"); *United

States v. Mehta*, 307 F. Supp. 2d 270, 275 (D. Mass. 2004) ("It is not at all uncommon in

sentencing to put the crime in the context of the defendant's life."); *United States v. Blake*, 89 F.

Supp. 2d 328, 332 (E.D.N.Y. 2000) ("In determining a sentence, it is worth attempting to

understand (as best one can) what set a defendant upon her illegal course. While it does not

excuse her conduct, [a defendant's] difficult background and misplaced – even sick – reliance on

men critical to her life provide a useful context.").

For an individual with a lengthy or serious criminal past, the achievement of a crime-free

life could be seen as a radical transformation constituting extraordinary rehabilitation. *Rosado*,

for instance, involved the arrest of a member of a gang that distributed large quantities of crack,

powder cocaine, and heroin in the Bronx. 254 F.Supp. 2d at 317. Judge Scheindlin, in

evaluating the question of the defendant's post-arrest rehabilitation, reasoned:

> While in jail, defendant successfully completed a shock
> incarceration program and obtained his high school equivalency
> diploma. He also appears to have given up drugs, found
> employment, and begun to support his children. He has severed
> his ties with his drug-dealing friends. After considering all of the
> circumstances here, including defendant's age, drug and alcohol
> rehabilitation, successful completion of the state's shock
> incarceration program, obtaining a GED and certificates of
> achievement earned while in state custody, gainful employment, an

> apparent break with his criminal comrades and a renewed
> commitment to his family, I conclude that defendant should receive
> a two-level departure for *extraordinary post-offense rehabilitation.*

*Id.* at 321 (emphasis added).

More difficult for the courts before *Booker* were cases where a defendant's starting point

did not hover at the nadir of civilized social development.

> A downward departure based on post-sentencing
> rehabilitation is only available when a defendant's rehabilitation,
> compared to his or her "starting point," is *sufficiently
> extraordinary* to take the defendant out of the heartland of cases
> contemplated by the Sentencing Commission in formulating the
> Guidelines. . . . After his arrest, [defendant] ceased using
> marijuana, participated in a substance abuse program, took
> narcotics tests, and maintained gainful employment. All of these
> were conditions of [his] release, and indeed are typical conditions
> for the release pending trial of a defendant charged with a narcotics
> offense. We see no basis on this record for finding [defendant's]
> *rehabilitation "extraordinary."*
> We do not thereby hold today that compliance with the
> conditions of pre-trial release cannot be evidence of *extraordinary
> rehabilitation*, or that compliance alone can never justify such a
> downward departure. We do conclude, however, that [defendant's]
> compliance with his conditions of pre-trial release here, compared
> to his "starting point," was *insufficiently extraordinary* to take him
> out of the heartland of cases contemplated by the Sentencing
> Commission in formulating the guidelines.

*United States v. Middleton*, 325 F.3d 386, 389-90 (2d Cir. 2003) (emphasis added). *See also*

*United States v. Khaykin*, No. 02-cr-603-01, 2003 WL 22772394, at *3 (S.D.N.Y. 2003)

("[Defendant's] rehabilitative efforts are not *so extraordinary* as to warrant a downward

departure. *[He] did not live a life of crime prior to this offense*; he had only one prior conviction,

for shoplifting, in 1997. His efforts in overcoming a two-year drug addiction are commendable,

but not sufficient to merit a sentencing departure.") (emphasis added).

Perhaps because of the difficulty of the task, the [Court of Appeals for the First Circuit] has mainly defined *extraordinary rehabilitation* by noting what it *is not*. In effect, case after case announces: No, that's not it, nor that, nor that. . . [.]

To be sure, it may be inevitable that appellate courts approach Guideline interpretation this way – defining when the standard is not met. After all the [Court of Appeals] sees only a small percentage of the cases that the district court reviews. The [court] reviews only those cases in which a district court has decided to depart, a fraction of the total number of cases, and then only those that the government chooses to appeal, a smaller number still. Moreover, the sampling of cases that the Court of Appeals receives are typically those that district courts have *deemed "extraordinary."* As a result, the [Court of Appeals] is not in a position to see the true "heartland" of cases that come through the courts. An individual case that stands out from the class of cases before a district court might seem humdrum when compared to the more limited and exclusive corpus of *"extraordinary" cases* that are actually appealed.

. . . It is [not enough] to intone these words *"extraordinary rehabilitation"* over and over again, when what we really mean is: Never.

*United States v. Perella*, 273 F. Supp. 2d 162, 165-66 (D. Mass. 2003) (emphasis altered).

The obvious anomaly under the Guidelines as some interpreted them – that people with relatively crime-free backgrounds could almost never show extraordinary rehabilitation though their post-crime conduct was blameless – was not lost on many sentencing judges who tried, usually with little success, to base downward departures on the concept of "aberrant" behavior. *See* U.S.S.G. § 5K2.20(b) ("The court may depart downward under this policy statement only if the defendant committed a single criminal occurrence or single criminal transaction that (1) was committed without significant planning; (2) was of limited duration; and (3) represents a marked deviation by the defendant from an otherwise law-abiding life."); *United States v. Castellanos*, 355 F.3d 56, 58-59 (2d Cir. 2003) ("The Sentencing Commission adopted this formulation of

section 5K2.20 by amendment in November 2000, responding to a circuit split regarding the appropriate legal standard for determining whether a defendant's offense constituted aberrant behavior. A majority of circuits had limited the aberrant behavior departure to single acts of spontaneity and thoughtlessness. A minority of circuits took a broader approach.").

In cases where the criminal records were not extraordinarily serious, but where the conduct was clearly not "aberrant," judges struggled with the question of what might amount to *extraordinary* rehabilitation; they often sought to identify extra facts regarding the *rehabilitation*, rather than the criminal record, that might distinguish the case from ordinary rehabilitation. For instance, in one case, the United States Court of Appeals for the Second Circuit reasoned:

> [Defendant's] work helping new inmates at the halfway house, and his regaining of the trust of his employer, do not establish *"extraordinary" rehabilitation.* . . . . Such a departure was affirmed in *United States v. Workman*, 80 F.3d 688 (2d Cir. 1996), where, before he was arrested, the defendant voluntarily left a narcotics conspiracy, joined the military and completed service honorably. And in *United States v. Cornielle*, 171 F.3d 748 (2d Cir. 1999), we agreed with the district court that *extraordinary rehabilitation*, combined with other factors, could justify a one-level downward departure for a former member of a narcotics and fraud conspiracy, who, in the four years between the commission of the crime and his arrest, had returned to college, was maintaining a high grade-point average, and was working part time as a volunteer counseling persons infected with HIV.

*United States v. Carpenter*, 320 F.3d 334, 343 (2d Cir. 2003) (emphasis added). *See also United States v. Woodley*, 344 F. Supp. 2d 274, 282 (D. Mass. 2004) (finding that "[t]he defendant went *beyond merely rehabilitating himself*, but reached out to others to share his experiences with them and to try to deter them from doing the same thing" by volunteering in a program that taught children about staying out of jail) (emphasis added); *United States v. Perella*, 273 F. Supp.

2d 162 (D. Mass. 2003) (finding *extraordinary rehabilitation* where defendant had previously struggled with drug addiction, including numerous relapses, but suddenly began attending alcoholics and narcotics anonymous meetings and other therapy sessions five times a week, helping other addicts, and lecturing young people about the dangers of substance abuse); *Normandeau*, 63 Fed. Appx. at 575 ("[The psychologist] also explained that [the defendant's] successful completion of the drug treatment program at the Addison County jail was particularly surprising because the inmates have to quit without the benefit of any of the available medications that treat opiate dependence. . . . [The court also found that the defendant] volunteers 10-12 hours a day helping in the kitchen with meal preparation, serving and clean-up. . . . In addition, the District Court indicated that it was 'frankly . . . impressed' by the letter that [defendant] submitted to the court regarding his backround, heroin addiction, rehabilitation and prospects for continued abstinence."); *United States v. Bradstreet*, 207 F.3d 76 (1st Cir. 2000) (finding *extraordinary post-sentencing rehabilitation*, which would now be unavailable under section 5K2.19 of the Guidelines, where defendant began tutoring other prisoners, teaching adult education classes in prison, serving as a prison chaplain's assistant and the clerk of a prison parenting program); *United States v. DeShon*, 183 F.3d 888 (8th Cir. 1999) (finding *extraordinary rehabilitation* where defendant radically altered his life, attending church four times a week, receiving counseling, and working over seventy hours a week to catch up on bills).

While, as already noted, the cases are difficult to rationalize, the Court of Appeals for the Second Circuit has discouraged downward departures for extraordinary rehabilitation that lead to substantially shorter periods of incarceration. *See, e.g., United States v. Boltz*, No. 03-cr-1527, 88 Fed. Appx. 471, 473-74 (2d Cir. Mar. 3, 2004) (unpublished) ("It is certainly true that a

defendant's rehabilitative efforts can, in the appropriate case, warrant a downward departure. We have emphasized, however, that such cases are 'rare.' . . . Although there was evidence submitted in this case [in support of extraordinary rehabilitation] the District Court provided neither an oral nor a written statement of the reasons or findings that persuaded it to find that [defendant's] rehabilitation was 'extraordinary.' As such, we are unable to review, in any meaningful sense, whether the District Court erred by granting [defendant a twelve-level] extraordinary-rehabilitation departure.") (internal quotation omitted); *United States v. Crispo*, No. 03-cr-1114, 75 Fed. Appx. 21, 23 (2d Cir. Sept. 10, 2003) (unpublished) (affirming sentence imposed at defendant's resentencing, where "the district court granted a one-level downward departure for extraordinary rehabilitation, but imposed a two-level upward departure based on [defendant's intent]."); *United States v. Carpenter*, 320 F.3d 334, 343 (2d Cir. 2003) ("Rehabilitation, even if 'genuine,' is not *ipso facto* sufficient to justify a departure. It must be so 'extraordinary' as to not have been taken into account by the Sentencing Commission in formulating the Guidelines."); *United States v. Blount*, 291 F.3d 201 (2d Cir. 2002) (affirming defendant's sentence of 292 months' incarceration, to be followed by a 10-year period of supervised release, which included a two-level downward departure for extraordinary rehabilitation); *United States v. Alvarez*, No. 01-cr-1283, 29 Fed. Appx. 659, 661 (2d Cir. Feb. 5, 2002) (unpublished) (affirming sentencing court's denial of downward departure on ground of extraordinary rehabilitation and noting that "[i]t is well established that we cannot review a district court's discretionary refusal to depart unless that decision was made in violation of law or resulted from a misapplication of the Guidelines.") (internal quotation omitted); *United States v. Cabrera*, No. 00-cr-1365, 4 Fed. Appx. 55, 56 (2d Cir. Feb. 16, 2001) (unpublished)

("[Defendant] appeals from the district court's denial of his requests for downward departures based on aberrant behavior and extraordinary rehabilitation. Because we have no authority to review the court's exercise of discretion, we dismiss the appeal."); *Pughe v. United States*, No. 04-cr-1507, 4 Fed. Appx. 65, 66 (2d Cir. Feb. 16, 2001) (unpublished) ("This case is in all relevant respects identical to *United States v. Bryson*, 163 F.3d 742 (2d Cir. 1998), in which we held that a departure . . . on rehabilitation grounds was not within [the court's] discretion. As in *Bryson*, the ruling below reflects 'unhappiness with the rigidity of the guidelines' rather than an evidence-based finding of 'extraordinary rehabilitation.' But, as our cases have emphasized, only the latter can support a departure."); *United States v. Kelly*, No. 00-cr-1212, 2 Fed. Appx. 209 (2d Cir. Feb. 6, 2001) (unpublished) (affirming defendant's sentence on defendant's appeal where the district court departed on the grounds of extraordinary rehabilitation and imposed a sentence of 180 months of incarceration on the first charge, 60 months on the second charge, and 180 months on the third charge, to run concurrently); *United States v. Matera*, No. 00-cr-1048, 234 F.3d 1263, at *1-2 (2d Cir. Oct. 18, 2000) (unpublished) ("Both defendants [– associates in the Colombo crime family –] requested downward departures. Matera requested one due to extraordinary family circumstances. Ferrara requested one for a combination of extraordinary family circumstances and extraordinary rehabilitation. The district court granted downward departures for both appellees on the grounds for which they were requested. . . . . This case is close, but, in the end we believe that the district court did not abuse its discretion; we therefore affirm its decision to grant downward departures as to both appellees."); *United States v. Bryson*, 229 F.3d 425, 425-26 (2d Cir. 2000) ("The United States appealed [a sentence which included a downward departure on the grounds of extraordinary rehabilitation.] In December 1998, this

Court vacated the district court's decision on the ground that the downward departure was not within the district court's discretion. This Court found that there was no evidence of extraordinary rehabilitation required to merit such a downward departure. Accordingly, we remanded the case to the district court to 'resentence [defendant] according to his original offense level of 31.' . . . . The district court understandably over-read our mandate. We concluded that the record and the findings in the district court were wholly insufficient to support a downward departure for an extraordinary rehabilitation. The terms of the remand . . . did not preclude a departure based on intervening circumstances . . . . We did not foreclose the possibility – however remote – of a rehabilitation that might occur between our decision and the resentencing. The Court has consistently held that a court's duty is always to sentence the defendant as he stands before the court on the day of sentencing."); *United States v. Ellison*, No. 00-cr-1114, 225 F.3d 646, at *2 (2d Cir. Aug. 21, 2000) (unpublished) (affirming district court's denial of downward departure where district court stated that "the fact that he has got a number of commendations for work he had performed on a couple of isolated instances, I just don't think rises to the level of extraordinary rehabilitation."); *United States v. Tenzer*, 213 F.3d 34, 43 (2d Cir. 2000) (remanding for resentencing based on clear risk that sentencing judge may not have fully understood authority to depart, where defendant sought a downward departure in part on the basis of extraordinary rehabilitation: "It is entirely consistent with the precedent in this Circuit granting district court judges discretion in sentencing to allow this district court judge to depart downwardly if he finds that this case is *sufficiently unusual or that it falls out of the heartland*.") (emphasis added); *United States v. Cornielle*, 171 F.3d 748, 753-54 (2d Cir. 1999) ("The sentencing court . . . stated that although [defendant's] request for a downward departure based

24

on extraordinary rehabilitation presented a close question, a departure exclusively on this basis was not warranted in light of all the facts. Such a departure would be within the court's power, since rehabilitation, as we have had occasion to say with regard to a defendant's drug rehabilitation efforts, may justify a downward departure from the sentencing guidelines range. . . . . Nonetheless, the court found that when [defendant's] unique combination of circumstances was considered as a whole, his case warranted a one-level departure. [The district court] held that the defendant carried, albeit just barely, his burden of showing that the exceptional circumstances applicable to his particular case, including . . . rehabilitation, are 'sufficiently extraordinary and sufficiently far removed from the heartland of the relevant guidelines as to warrant a modest departure.' We see no abuse of [the court's] discretion in granting only a limited downward departure."); *United States v. Bryson*, 163 F.3d 742, 747 (2d Cir. 1998) ("Extraordinary rehabilitation . . . is not narrowly defined or limited to cases of defendants overcoming their drug addiction. . . . . [W]hile a sentencing court may consider a broad range of information in determining whether to depart downward, it must nonetheless conclude that certain circumstances of the case are unusual enough for it to fall outside the heartland of cases in the Guideline. To resolve this question, the district court must first make a refined assessment of the many facts bearing on the outcome, informed by its vantage point and day-to-day experience in criminal sentencing. The district court has an 'institutional advantage,' that is, a special competence about the ordinariness or unusualness of a particular case, which is to be accorded substantial deference by the appellate courts.") (internal quotation and citation omitted); *United States v. Silvestri*, No. 97-cr-1430, 165 F.3d 15, at *5 (2d Cir. Oct. 29, 1998) (unpublished) ("[Defendant] claims that we should vacate his sentence because the district court failed to

consider his application for a downward departure on the ground of extraordinary post-offense rehabilitation. . . . It is evident from the record of the sentencing hearing, however, that the district court was well aware both of the full nature of [defendant's] downward departure motion and of the scope of its own authority to depart from the Sentencing Guidelines. . . . Under these circumstances, we cannot conclude that the district court gave insufficient consideration to [the] application for a downward departure on the basis of extraordinary rehabilitation."); *United States v. Tejeda*, 146 F.3d 84, 86, 88 (2d Cir. 1998) ("The district court rejected departure on the bases of extraordinary family circumstances and extraordinary rehabilitation. However, the district court did grant a downward departure . . . . [T]he district court incorrectly applied the Guidelines by downwardly departing based on three impermissible factors (previous lenient sentences, length of co-defendant's sentence, and small amount of controlled substance) and two factors already considered by the Sentencing Commission in establishing the Guidelines range (family circumstances and deportation). We cannot conclude that the district court's error was harmless inasmuch as no permissible ground for departure remains. In light of the foregoing, we conclude that the district court abused its discretion; accordingly, we vacate the judgment and remand for resentencing.").

C. Extraordinary Rehabilitation and Ordinary People

A question posed by the instant case is how a sentencing judge may achieve the objectives of sentencing when a defendant has led a relatively crime-free life, falls into criminal conduct, and returns to a law-abiding life when confronted by the law's terrors. Can such rehabilitation ever be extraordinary?

At oral argument in the instant case members of a panel of the United States Court of

Appeals for the Second Circuit recognized the dilemma inherent in the rehabilitation issue under

the Guidelines:

> [THE GOVERNMENT]: The defendant was a financial criminal.
> She committed the crime while she had a job. For her to claim that
> she continued to have a job doesn't demonstrate any relevant
> source of rehabilitation.
> THE COURT: Could a non-addict, white collar criminal ever
> satisfy the requirement of extraordinary rehabilitation?
> . . . .
> THE COURT: It sounds like the worse you are, the better the
> chances you'll have extraordinary rehabilitation. It's kind of an
> odd –
> [THE GOVERNMENT]: I think that's a paradox of sentencing but
> yes, your Honor.
> THE COURT: If you're not such a bad fellow or gal and you really
> are sorry, that's not going to do it.
> [THE GOVERNMENT]: That's correct, your Honor.
> THE COURT: She would have been better off having really done
> something really terrible, right, in the past, and then one could say
> that if we compared a baseline of having done something very
> terrible, that what she's done now might constitute extraordinary
> rehabilitation. But because of the fact . . . that basically, she had
> very few run-ins with the law, she finds herself not eligible for
> extraordinary rehabilitation, under your view.
> [THE GOVERNMENT]: That's correct, your Honor, under the
> Court's precedent. . . .
> THE COURT: . . . These [G]uidelines are a straight jacket but you
> play with the cards you've got.
> . . . .
> THE COURT: So is the rehabilitation the fact that she's trying to
> develop skills to get her out from underneath the control of her
> father, who has obviously been an extraordinarily bad influence on
> her?
> . . . .
> [THE GOVERNMENT]: . . . She has continued employment;
> that's great. But in a financial case, in a fraud case, it's also not
> that unusual.
> THE COURT: You can't separate – just saying – it's easier to
> identify extraordinary rehabilitation when you're addicted to
> cocaine. You get yourself into treatment, you do well and you
> come out clean and you stay clean for a period of time, up to the

time you get sentenced. So the court says, wow, that's pretty
extraordinary. This guy was hooked badly.
   But this is a little bit different. She was attacking the root
cause of her criminality, her dependence on her father and her
cyclical unemployment. Wouldn't that be relevant for Judge
Weinstein to find extraordinary [–] that her conduct juxtaposed to
the way she had lived her life prior to her criminality was
extraordinary in that regard?
[THE GOVERNMENT]: [S]he was not dependent on her father,
except perhaps psychologically.
. . . .
THE COURT: [T]he court can't look at underlying social causes
that are at play in her life to understand what she's trying to do to
alter those? The court couldn't do that?
[THE GOVERNMENT]: Of course the court looks at the whole
person on the date of sentencing, absolutely. But the point here is
that what she was doing, her life situation in that respect, in respect
of her employment or education, does not appear to have anything
to do with her motivation for committing the crime.

Dec. 13, 2004 Ct. App. Tr. at 6, 7, 14, 18, 19.

The Federal Sentencing Guidelines permit a lesser sentence upon a showing of

"extraordinary rehabilitation," which, as explained above, often means turning a "bad" life into a

decent, honorable, law-abiding life. For those who have led decent, honorable, law-abiding lives

to the point of criminality, the Federal Sentencing Guidelines, as construed by some, offer, as

already noted, the remote possibility of relief via a different path – when the defendant can show

that the criminal conduct was "aberrant." The question then becomes, what of the relatively

decent, generally law-abiding citizen who errs more than once, or over some extended period, but

once prosecuted, is likely to be done with crime for good. A theoretical challenge is how, under

the Guidelines, an individual can demonstrate that a return to "normal" or "average" is

extraordinary.

Since *Booker* the answer seems to be that such a person gets no help from the Guidelines,

28

but does from the much broader and more flexible section 3553 of title 18 of the United States Code. *Cf. United States v. Brady*, No. 04-cr-0729, 2005 WL 1706509, at *8 (2d Cir. July 22, 2005) ("The fact that we find [that] the district court's decision to depart in this case does not conform to the requirements of the Guidelines – now made advisory by *Booker* – would not necessarily render [defendant's] sentence unreasonable."). That provision requires the court to avoid a sentence greater than necessary. 18 U.S.C. 3553(a) ("The court shall impose a sentence sufficient, but not greater than necessary . . . .").

Even under the Guidelines, however, there is a strong argument to be made that "extraordinary rehabilitation," while perhaps something of a tautology, is satisfied when a relatively decent person falls into bad conduct, but immediately and permanently repents. Despite the tendency in the caselaw to treat "rehabilitation" as a simple renewal or rebirth, the concept is more complex.

Rehabilitation, from the root to "make fit again," is usually defined as: (1) "re-establishment of a person's reputation; vindication of character; " (2) "the action of replacing a thing in, or restoring it to, a previous condition or status;" (3) "restoration to a higher moral state;" (4) [r]estoration (of a disabled person, a criminal, etc.) to some degree of normal life by appropriate training." THE COMPACT OXFORD ENGLISH DICTIONARY 1547-527 (2d ed. 2002). *See also* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY UNABRIDGED 1914 (1993) (defining rehabilitation as "the vindication of one's character," "the process of restoring an individual (as a convict, mental patient, or disaster victim) to a useful and constructive place in society through some form of vocational, correctional, or therapeutic restraining or through relief, financial aid, or other reconstructive measure," and "the restoration of something damaged or

deteriorated to a prior good condition."); BLACK'S LAW DICTIONARY 1287 (6th ed. 1990) (defining rehabilitation as "[r]estoration of [an] individual to his greatest potential, whether physically, mentally, socially, or vocationally"). This notion of *"re*habilitation" is echoed in terms like *re*storation, "to place back," and *re*demption, "to gain back." Rehabilitation, according to these definitions, signifies a return to a former self, not the creation of a new person. *See, e.g., United States v. Blake*, 89 F. Supp. 2d 328, 341 (E.D.N.Y. 2000) ("At its most basic level, rehabilitation theory assumes that [behavior] is mutable and that [persons] can learn to conform to social norms. A crime was committed due to some ethical or moral defect that can be repaired enabling the [individual] to return to his or her 'normal' behavior.").

Black's Law Dictionary now conveys a different notion of the individual being rehabilitated, one more reflective of the theory of "just deserts" which informs the Guidelines. *See* BLACK'S LAW DICTIONARY 1311 (8th ed. 1999) (defining rehabilitation as "[t]he process of seeking to *improve* a criminal's character and outlook so that he or she can function in society without committing other crimes") (emphasis added). It assumes that the person being rehabilitated is basically "a criminal" rather than an "individual," a "person," or even a "convict." Having grounded the definition on a "criminal" identity necessitates the conclusion that returning a person to an original state would return her to a life of crime.

The definitional tension reflects the theoretical one: if we accept that good people can falter, rehabilitation can be achieved through a return to the good. If we assume that failure to abstain from crime is the mark of a criminal nature, rehabilitation requires a transformation to a different, better character.

Accepting as a founding principle that a human being is always more than the worst thing

30

he or she has ever done, the restorative definition of rehabilitation (as a "return to the good") is appropriate. So too is the transformative model (a "change for the better"). *Both* lead to the result the law seeks under section 3553: a law-abiding member of society. A person without a serious criminal history who has made a remarkable shift back to the person she was before criminality, or even beyond, should not be precluded from relief because she does not counsel HIV patients, tutor prisoners, or join the military – as in some of the cases requiring such acts as a basis for a finding of extraordinary rehabilitation. While these are noble deeds, they are not always realistic for someone like Chastity Hawkins, who now works 60 hours a week, and for whom it is difficult to fit even elemental parenting into her work schedule.

Instant and full rehabilitation may not be required to support a finding of extraordinary rehabilitation. A sudden insight and change of character, an epiphany of biblical character, is not essential or even common. *See, e.g., United States v. Kane*, 88 F. Supp. 2d 408, 413 (E.D. Pa. 2000) ("The court is not so naive as to assume that the defendant will be able to renounce twenty-five years of destructive behavior easily . . . ."). On the journey to rehabilitation – or, more aptly, the clawing up from the pit of criminality – there may be digressions and slippages with ultimate success. *See id.* at 409, 411 ("While under supervision of Pretrial Services, [defendant] tested positive for drug use several times . . . . While the court acknowledges that [defendant] still has a very long and tenuous path . . . ahead of him, he has already made significant steps towards that goal."). Even the most moral person who needs no rehabilitation may from time to time contemplate wandering off the straight and narrow path. *See, e.g.,* Charles Mohr, *Carter, on Morals, Talks with Candor*, N.Y. TIMES, Sept. 21, 1976 (discussing former president's admission that he lusted in his heart while never externally violating the Ten

Commandments).

Certainly, as required by section 3553 post-*Booker*, in considering the offender's characteristics with greater depth and breadth than through a simple automatic index of past offenses, "extraordinary rehabilitation" may take into account a person's "starting point" in terms of family history, socioeconomic position, and significant personal obstacles. This approach reflects an understanding that "the consequences of an act go endlessly forward in time and its causes stretch back to the dawn of human history . . . ." *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 295 (2d Cir. 1999).

A child forced into crime by a criminal father surely emerges from a different starting point than the child of a legitimately employed parent. The father of defendant Chastity Hawkins was not only a criminal, but an alcoholic who impressed his wife and children into crime. Defendant's background reflected social as well as socioeconomic deprivation – a scarred personality as well as an acid-etched visage. That she has progressed from an irresponsible white collar criminal to a law-abiding hard working citizen is quite extraordinary, given this starting point. (The problem of dealing with an advantaged youngster who commits crimes not induced by economics or other need – the Leopold and Loeb syndrome among others – is left for another day.)

Since *Booker*, the Guidelines are no longer a straight jacket binding courts to artificially created and cruel paradoxes of sentencing, by insisting not only on rehabilitation, but on "extraordinary" rehabilitation.

### IV. Oral Conclusions at Hearing

Immediately at the conclusion of the post-remand hearing the court dictated the following

oral conclusions into the record (Transcript of July 12, 2005 at 194-206) (non-substantive punctuation and other minor changes have been made without indication):

"This case is before the court pursuant to a mandate of the United States Court of Appeals for the Second Circuit filed March 14th, 2005. The case was remanded for further development of the record so that the district court could make findings of fact as to the existence of the defendant's extraordinary rehabilitation. In addition, the Court of Appeals vacated the district court sentence.

"The nature of the remand presents legal difficulties. If the case were remanded solely for findings of fact based on the factual development at the time of sentencing, the court would arguably be limited to the evidence then available and would be required to draw necessary inferences to support its conclusion that extraordinary rehabilitation had been accomplished based solely on that evidence. The case would then be presumably reconsidered by the Court of Appeals to determine whether those findings and that evidence supported the conclusion of extraordinary rehabilitation upon which a downward departure was made in the sentence. But the sentence was vacated.

"A vacation of the sentence suggests that the defendant must now be resentenced. If she were to be resentenced, it would be on the basis of the information presently before the court, because the court at the time of resentence must consider all available information. The matter is of some significance because the government relies upon evidence of cheating with respect to unemployment insurance that took place before the last sentence, but was not known to the government and not brought to the court's attention until the present resentencing. If defendant is to be resentenced now, the court should consider that information.

"There is another compounding factor: that is, if defendant were to be resentenced now, it would be on the basis of *Booker* so that the court would not be limited to the Guidelines. It could consider other section 3553 criteria. Even if the court could not consider section 3553 criteria because the sentence was vacated solely for the purpose of permitting new findings without authorizing a new sentence by this court, under *Booker* and Second Circuit Court of Appeals decisions, since the case would still be pending in that court, it would remand the case so that this court could consider 3553(a) criteria. As the learned attorney for the government has suggested, given those considerations, this court should express its views on what it would do were the Court of Appeals to remand the case for a post-*Booker* hearing.

"With those problems presented by the nature of the remand and its timing, we now approach the findings and the history of the case on sentencing.

"The crime was a serious one, but the court had to take into consideration the fact that it was induced by a mother and father who themselves were criminals, at a time when this defendant was much younger and in the thrall of her criminal father. She was, at the time the crime was committed, a dropout from school who spent her time partying, who was irresponsible, who had a child out of wedlock, and who was largely ignoring her duty to the child, to herself, and to society.

"At the time she came before this court for original sentencing, the court observed her background and her attitude and reports of the presentence officer supervising her case and had a strong impression that she may have bottomed out, that is reached the end of her difficulties, and that she was coming back into useful society. Accordingly, it adjourned the sentence for one year with a direction to Pretrial Services to supervise her closely in order to determine whether she: 1)

was in the process of rehabilitation; and 2) was rehabilitated.

"The clear indication the court received from the presentence officer in charge of the case at the time of original sentencing was that she was in the process of rehabilitating herself. She was taking a closer interest in her child. She was trying to educate herself. She was attempting to obtain responsible employment. She had largely ceased her partying and irresponsible conduct.

"The court was authorized to take into account these improvements. It was the position of the government, however, that the court could not consider her improvements during that period of presentence supervision. The September 15th, 2003 sentencing transcript at page ten reveals the government's counsel making the following statement: 'I just wanted to make clear one ground of my objection, so the record is clear. The extraordinary rehabilitation that your Honor has made a finding of has come about in large part due to your Honor adjourning the case for a year and I object to that, giving her the opportunity to build a record.'

"That was an extraordinary statement by the government. It seems inconsistent with the general theory of rehabilitation and is certainly inconsistent with section 3553(a). Monograph 111 of the office of Probation and Pretrial Services Administrative Office of the United States Court, *The Supervision of Federal Defendants*, revised September, 2003, states at page 1: 'Pretrial Services is a front door to the federal criminal justice system and has a unique opportunity to lay the foundation for each defendant responsible for their success, not only during the period of Pretrial Services supervision, but even beyond that time period. Officers strive to work with each defendant in such a manner that this contact with the criminal justice system will be his/her last and so prevent the front door of the system from becoming a revolving door.'

That is to say, the purpose of Pretrial Services is to do whatever it can to assist in the rehabilitation of the defendant during the period when Pretrial Services is in control of the defendant.

"Monograph 109 of the Office of Probation and Pretrial Services Administrative Office of the United States Court, *The Supervision of Federal Offenders*, revised March, 2005, states at page 1-1: 'Officers maintain awareness of the behavior of those they supervise and, depending on the circumstances and conditions of the case, implement restrictive and correctional strategies to encourage pro-social behavior and facilitate positive change. This multidimensional role does not mean that each officer is expected to be an expert in all areas. Rather, officers are to serve as participating case managers.' The rest of the monograph, which I will not quote at length, goes on to indicate this obligation of our Probation Service to supervise in order to rehabilitate and to make sure that people lead a law-abiding life, so that they do not slip back into crime.

"In the Eastern District of New York, we have a division in Pretrial Services which makes a special effort to rehabilitate defendants when they are placed under its supervision, particularly when an adjournment of sentence is provided for. We have had many successes with rehabilitation during this extended presentence period. Probation and Pretrial Services are known throughout the country, and particularly in this court, for strong drug and other rehabilitation programs, including obtaining jobs for people, training them on how to work, training them on how to take care of their children and other responsibilities, and the like.

"This series of rehabilitative programs was effectuated while the Guidelines were mandatory. They have become even more important since *Booker* because of the increased emphasis on rehabilitation rather than mere "just deserts" mechanical sentencing under the

Guidelines.

"It is true that from time to time, and not infrequently, defendants slip back during the process of rehabilitation. After all, in many instances, they come from exceedingly difficult backgrounds. As middle class people, most judges have had advantages in the way of home environments, schooling, security, and the like. It behooves us not to underestimate the extreme pressures a young person is under in trying to extricate himself or herself from a family with a criminal background, from an illegitimate child situation, and from a paramour who is a long-time criminal. An example is the class of drug cases, where we understand there will often be some slippage, yet we proceed to continue to supervise so that the cycle of sliding back into drugs is reduced and ultimately eliminated.

"It is also true of the lapses from attempts to obtain education. Many relatively poor people have attained their education in high schools or colleges at night while working. The circumstances of such people – particularly if they come from dysfunctional families – provide serious extra hazards to continued education. In the case of this defendant, she did register at the Interboro Institute and dropped out. The New York Times, July 12th, 2005, page one, on the speedy growth of private schools, raises related questions. The article points out that the Interboro Institute is a private for-profit educational institution which has steadily raised its enrollment. It increased its student body by 265 percent from 1999 to 2004. Its graduation rate is only 14 percent. It is providing poor persons some education with high tuition fees, $8,600, and a high federal loan default rate of 20 percent. The defendant is not unique in dropping out of this school.

"I believe her when she says that she desires further education. In fact, she has

37

accomplished an extraordinary degree of self education, having trained herself in computers and the internet. She is now holding two jobs as a dispatcher. The job of a dispatcher in New York City is extremely difficult. It requires constant pressure to get cars where they are supposed to be, to deal with clients who often feel aggrieved and to keep track of an enormous amount of information as moving vehicles are picking up and dropping passengers all over the city. It requires a high degree of skill in computer technology and in the ability to handle peers, superiors, subordinates, and the general public.

"The indications that this defendant is on the way to rehabilitation in the sense that she is trying hard to lead a responsible, law-abiding life, are reflected in the last two years. These are years where apparently she has been crime-free. But it was reflected even before the original sentence after her year of presentence delay. The fact that she engaged in a fraud on the state when she was being supervised is extremely serious, but she has apparently reversed that descent back into a life of crime.

"Based on the information at the time of the original sentencing, there was strong evidence of rehabilitation supported by information from the Pretrial Services officer, and by an improving relationship with her daughter. After that sentence, rehabilitation continued despite one serious crime against the State Unemployment Compensation Fund. She now holds two jobs and works very long hours under great pressure to the satisfaction of both employers, including a well-known major law firm. She maintains a good relationship with her child, although the child is in Pennsylvania, partly to keep her in a better environment. She has married the father of the child. That gives the child a better chance to maintain an improved emotional relationship with him even though he is in prison. She is paying back arrears in restitution. She will pay back the

loss to the state unemployment funds through state income tax refunds.

"The court considers section 3553(a) and all the elements under (a)(2). Seriousness of the offense was great. Punishment to promote respect for the law was required. Just punishment for the offense is a factor to be considered. Adequate general deterrence of criminal conduct is a factor that must be considered. In this case defendant's father and many others were punished in connection with the crime defendant was involved in.

"Specific deterrence is no longer required for this defendant who has shown strong, successful rehabilitative efforts. There is no clear necessity to protect the public from further crimes by this defendant. The court is convinced, based on the information presented to it, that the public will not be in any substantial danger of further crimes by this defendant. The court fully credits her testimony at this hearing.

"The court must consider providing the defendant with needed educational or vocational training and other correctional treatment in the most effective manner. It concludes that the most effective manner of providing that training and treatment is while she is on probation, and not while she is in prison. If she is placed in prison, she will be effectively cut off from future employment, from a stable relationship with her daughter, and from positive rehabilitative possibilities.

"The court has considered the kinds of sentences available. They include a substantial term of incarceration and a combination of incarceration and probation. The combination is not desirable because any substantial cutting off of her freedom will in effect doom her.

"The court considers the details of the Sentencing Commission's Guidelines. It finds that, considering all the elements of the Sentencing Commission reports and Guidelines, a

downward departure at the time of the original sentencing was appropriate. If the court were to sentence the defendant now, such a departure would be appropriate. If the case were remanded under *Booker* for resentencing, the court would, based on the information now available, impose the same sentence of probation that was previously imposed.

"Consigning this defendant to prison now would not only violate the essence of section 3553 and the Sentencing Guidelines, but would constitute a destructive act of cruelty on a mother and child with an evil unjustifiable impact on society, increased costs to the taxpayers of incarceration, and probable welfare payments for the child and the mother after her release from prison.

"The court in making its determination considers the opinion of the United States Court of Appeals for the Second Circuit in *D'Allesandro versus the United States*, 517 F.2d 429 at page 437, footnote 9, where Judge Friendly, writing for the court, reversed the release of a defendant in a Board of Parole situation, but, with the wisdom and compassion for which that judge was known, pointed out that even though the defendant had to be returned to prison for a new parole determination pursuant to the Code of Federal Regulations, 'The hardship of such return after more than five months probation and D'Allesandro's record during this period are new factors to be taken into account.'

"In short, what a defendant is doing while free is of great significance in determining whether that defendant has made, or is in the process of making, a success of her life. Rehabilitation should not now be destroyed by wanton and unthinking application of mechanical rules for imprisonment."

V. Post-Hearing Findings of Fact and Conclusions of Law

40

Following the close of the evidentiary hearing, the court considered proposed findings of fact by both parties submitted at its request. It makes the following findings, drawing on both parties' proposals and its own conclusions. *See* Part IV, *supra.*

A. Findings of Fact

1. The defendant is the daughter of Quentin Hawkins, the leader of a massive criminal conspiracy, in which the defendant participated, at the request and under pressure from her criminal mother and father, to defraud insurance companies by staging automobile accidents and then fraudulently collecting insurance payments. The defendant's sibling also participated in these crimes under direction of the father.

2. Between January 1999 and August 2000, the parents' criminal organization staged numerous accidents in Brooklyn and Queens as part of a conspiracy involving some 60 persons and a number of health facilities and law offices.

3. The defendant participated in two of those accidents: on November 1, 1999, for a total *intended* loss of $80,233.00 from no-fault insurance and $9,020,500.00 from the subsequent lawsuit for bodily injury claims; and on November 28, 1999, for a total loss of $91,977.00 from no-fault insurance and $1,281,00.00 from a subsequent lawsuit for bodily injury claims.

4. While the presentence report utilized the total amount in paragraph 3, *supra*, during the original sentencing hearings, the government agreed that this amount overstated the loss and that the insurance company's reserve amount should be used instead. The court adopted the government's analysis in computing restitution.

5. The defendant and one of her co-conspirators filed, at the insistence of the senior Hawkinses, a personal injury lawsuit claiming more than $9 million in damages from the

41

November 1, 1999 staged accident. On or about December 18, 2000, in support of her claim, the defendant falsely testified at a civil deposition that the accident was genuine.

6. The defendant recruited other passengers, at the direction of her parents, to participate in the staged accidents.

7. The defendant was arrested on August 15, 2001 and pleaded guilty on May 28, 2002 to Count 32 of the indictment with full revelation of her part in the conspiracy.

8. On August 15, 2001, the defendant was released on bond.

9. There was no plea agreement between the parties. In her plea allocution defendant admitted to participation in a single staged accident. An initial sentencing proceeding was held on September 25, 2002. The Court adopted the loss calculation of $148,814.00 that was recommended by the government. That and other factual findings resulted in enhancements that increased the final offense level from a base of 6 to a final offense level of 13. The sentencing range applicable to offense level 13, criminal history category I, is 12 to 18 months.

10. The defendant moved for a downward departure on the grounds of extraordinary family circumstances and extraordinary rehabilitation. A short adjournment was granted until October 3, 2002. On that date a further adjournment of approximately one year was granted so that the defendant could have "a chance to show full rehabilitation."

11. Sentence was imposed on September 15, 2003. Prior to sentencing the court received an update from the Pretrial Services Agency on the defendant's successful efforts to maintain employment and on other positive aspects of her life.

12. As reflected in the record of the proceedings on and before September 15, 2003, and based on the information then before the court, it determined that the defendant had displayed

extraordinary rehabilitation and granted a downward departure of 5 levels for that reason.

Sentence was imposed at offense level 8, criminal history category I. A sentence of three years

probation from the date of the imposition of sentence and restitution of $148,814.00 was ordered.

13. On appeal, the government argued that the district court erred in departing downward

five levels on the ground of extraordinary rehabilitation.

14. Pursuant to what was then the recently enacted Prosecutorial Remedies and Other

Tools to End the Exploitation of Children Today Act of 2003 ("PROTECT Act"), Pub. L. No.

108-21, 117 Stat. 650 (2003), the district court's downward departure was reviewed *de novo*.

The United States Court of Appeals for the Second Circuit, in exercising *de novo* review,

concluded:

> [W]e must ascertain whether the defendant's rehabilitation is truly extraordinary.
> However, in the instant case, the district court failed to detail its reasons or factual basis
> for finding the defendant's rehabilitation to be extraordinary. As a result, we are unable
> to determine whether or not the district court erred in downwardly departing.
> Accordingly, we **VACATE** the district court's sentence and **REMAND** "for further
> development of the record so that the district court can make findings of fact as to the
> existence of [the defendant's] extraordinary rehabilitation."

Mandate, 03-1637 (emphasis in original) (citation omitted).

15. Before the issuance and filing of the mandate in the instant case, the United States

Supreme Court decided *United States v. Booker*, 125 S.Ct. 738 (Jan. 12, 2005). In addition to

making the Sentencing Guidelines advisory rather than mandatory, *Booker* invalidated the *de*

*novo* standard of review set forth in the PROTECT Act. *See id.* at 765-66 ("In 2003, Congress . .

. add[ed] a *de novo* standard of review for departures and insert[ed] cross-references to §

3553(b)(1). In light of today's holding, the reasons for these revisions – to make Guidelines

sentencing even more mandatory than it had been – have ceased to be relevant. The pre-2003

text directed appellate courts to review sentences that reflected an applicable Guidelines range for correctness, but to review other sentences – those that fell 'outside the applicable Guideline range' – with a view toward determining whether such a sentence '*is unreasonable*, having regard for . . . the factors to be considered in imposing a sentence . . . .' In other words, the text told appellate courts to determine whether the sentence 'is *unreasonable* with regard to § 3553(a). Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing. Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable.") (emphasis in original).

16. In a decision of December 30, 2004, the Court of Appeals vacated the sentence and ordered a remand for further factual findings by this court as to the decision to depart for extraordinary rehabilitation. The mandate was issued on March 2, 2005 and filed in the Clerk's Office of the Eastern District of New York on March 14, 2005. The mandate did not reflect any consideration of the intervening decision of the Supreme Court in *Booker*, or of the decision of the United States Court of Appeals for the Second Circuit in *United States v. Crosby*, 397 F.3d 103 (2005).

17. On April 5, 2005, appointed counsel for the defendant submitted requests for resentencing that included an application that this court again grant a departure for extraordinary rehabilitation and that the original sentence be imposed as a non-Guideline sentence under *Booker* and *Crosby*.

18. At the suggestion of this court, counsel for the defendant moved in the Court of Appeals for a clarification of the authority of this court to address issues raised by *Booker* in rendering a new sentencing determination. As of this date no such clarification has been received

44

by this court.

19. A hearing was held on July 11 and July 12, 2005, in order to comply with the mandate of the Court of Appeals. The parties agreed that this court should not only render a decision as to factual findings relating to the departure but that findings should also be made based on the current applicability of statutory sentencing criteria. *See* 18 U.S.C. § 3553. The court has adopted that approach.

20. At the hearing the defense called the defendant, Chastity Hawkins, who testified on her own behalf. The court found her testimony credible.

21. The government called five witnesses. They were credible. They revealed evidence of a crime committed by defendant not presented by the government at the time of the original sentencing.

22. Following her arrest in this case, the defendant was employed as a teller for Lefta Check Cashing, in Brooklyn, New York, from September 2001 through October 2001.

23. In or about June or July 2002, she was interviewed by United States Probation Officer Michael Zappel during the preparation of her presentence report.

24. During the Probation Officer's interview, the defendant admitted that she was terminated from Lefta Check Cashing because she approved the cashing of counterfeit checks.

25. The defendant told the Probation Officer that her employer offered to rehire her after the employer realized she had done nothing wrong. This claim was false.

26. In or about July or August 2002, the Probation Officer telephoned Lefta Check Cashing. The manager stated to the Probation Officer that Lefta Check Cashing never offered to rehire the defendant since they were continuously discovering misbehavior on her part. This

information is accepted by the court as true.

27. On July 7, 2005, the Probation Officer spoke to the owner of Lefta Check Cashing. The owner confirmed that the defendant was terminated for approving counterfeit checks and that the owner never offered to rehire the defendant.

28. The former manager of Lefta Check Cashing, Ms. Goodluck, and the current manager of Lefta Check Cashing, Mr. Magloire, both testified that the defendant was terminated for approving counterfeit checks and that Lefta Check Cashing never offered to rehire the defendant. Their testimony is accepted as accurate.

29. Ms. Goodluck, the manager of Lefta Check Cashing at the time the defendant was terminated, testified that the defendant never sought the manager's approval before cashing the counterfeit checks and that the defendant claimed that she knew the alleged customer. She stated further that the defendant was not able to provide additional information about the alleged customer, and that when the manager retrieved the film from the security camera, which should have contained a photograph of the alleged customer, there was no photograph.

30. During the original sentencing proceedings, the defendant urged the court to grant a downward departure based on her extraordinary family circumstances, in addition to extraordinary rehabilitation. She argued that she was basically a law-abiding person who was briefly led astray into aberrational criminal conduct. She submitted a letter from a neighbor and childhood friend who stated that the defendant "was always considered a challenging young lady. Never afraid to go up against the most difficult task and defeat it . . . is a loving and caring mother." In support of her current claim of extraordinary rehabilitation, she candidly admitted that before her arrest she was not a great mother and had maintained a bad attitude toward her

46

employment responsibilities.

31. As already noted, the Court delayed the original sentencing date for almost one year, until September 15, 2003, to give the defendant an opportunity to demonstrate extraordinary rehabilitation:

> THE COURT: What I'm going to do is this. I'm going to put off sentencing for a year to give you a chance to show full rehabilitation, okay?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Under those circumstances, I'll very seriously consider a favorable probationary term; okay? Because I didn't want to send you to prison as the law requires and I don't think there's been sufficient showing of rehabilitation for me to depart.

32. During the nearly year-long adjournment of her sentencing, while the defendant was released on bond and under strict supervision of the Pretrial Services Agency, the defendant committed insurance fraud.

33. The defendant defrauded the New York State Department of Labor Unemployment Insurance Fund by falsely certifying she was unemployed and then fraudulently collecting unemployment insurance payments.

34. The defendant started employment with Skyline Credit Ride on November 6, 2002. She received weekly wages from November 2002 to the present. As of September 14, 2003, the defendant had submitted pay stubs to her Pretrial Services Officer which reflected a total gross year-to-date income of $20,345.50.

35. Each week during the period from November 2002 through August 2003, the defendant falsely certified to the New York State Department of Labor Unemployment Insurance

Division that she was unemployed, though she has been consistently employed by Skyline Credit Ride from November 2002 to the present.

36. As a result of her weekly false certifications, the defendant claimed and collected employment insurance benefits from November 2002 through August 2003.

37. On 38 separate occasions, from November 10, 2002 through August 3, 2003, the defendant made false certifications to the New York State Department of Labor Unemployment Insurance Division. She endorsed 38 weekly unemployment insurance benefit checks, each time falsely stating: "I certify that on each day during the period(s) shown on the front of this check I did not work in employment or self-employment and I was ready, willing and able to work, except as reported to the Unemployment Insurance Telephone Claims Center."

38. From November 10, 2002 through August 3, 2003, the defendant made weekly false telephone certifications to the New York State Department of Labor Unemployment Insurance Telephone Claims Center certifying that she was unemployed during the weeks she was employed by Skyline Credit Ride.

39. The New York State Department of Labor warns claimants that false reporting of unemployment resulting in fraudulent receipt of benefits is subject to criminal prosecution.

40. The New York State Department of Labor was alerted to the defendant's fraud as a result of a computer generated cross-match between the New York State Department of Taxation database, which revealed the defendant's employer's tax withholding for the defendant, and the New York State Department of Labor's unemployment insurance records, which recorded the defendant's collection of unemployment insurance benefits during the same time period.

41. Before the New York State Department of Labor discovered the fraud, the defendant

48

had collected $6,268.50 in unemployment insurance benefits to which she was not entitled.

42. Following the defendant's arrest in this case, she was released on bond pending trial and subject to the standard conditions of release and sanctions for violating those conditions, including the condition that she not commit a Federal, State, or local crime during the period of release. The defendant committed her unemployment insurance fraud crime while on release pending trial. The court was not informed of this fraud before the original sentencing.

43. During November 2002 through August 2003 the defendant was under supervision of the Pretrial Services Agency for the Eastern District of New York and reported weekly to that agency. The defendant weekly committed her unemployment insurance fraud despite her weekly Pretrial Services supervision.

44. The defendant concealed her commission of unemployment insurance fraud from her Pretrial Services Officer.

45. On September 15, 2003, the defendant appeared before the court for sentencing. She told the court that she had learned her lesson from her current offense of conviction. She stated to the court, "I've learned a lot through this experience with the whole ordeal . . . ."

46. The defendant concealed her commission of unemployment insurance fraud from the court during her September 15, 2003 sentencing proceeding. The defendant, through counsel, argued to the court that the defendant "fulfilled every expectation that the court might have had of her in adjourning the matter last year and I request there be a departure to probation."

47. As noted, the court departed "downward to offense level eight, five levels, in view of extraordinary rehabilitation" and sentenced the defendant principally to probation and restitution.

48. On July 11 and July 12, 2005, the court held an evidentiary hearing following remand

from the Court of Appeals "for further development of the record so that the district court [could] make findings of fact as to the existence of [the defendant's] extraordinary rehabilitation."

49. The defendant testified on her own behalf. During her direct testimony at the hearing on remand, she stated that before her August 2001 arrest in this case, "[I]f I wasn't working, I was on Public Assistance. I was getting help from my father and Public Assistance paid my rent. I used to go party every week, just shop." She also stated that before her August 2001 arrest, "I wouldn't say I was a great mom. I wasn't like really into [my daughter's] school activities."

50. Despite the fact that her daughter no longer lives with the defendant, but instead resides in Pennsylvania with defendant's mother-in-law, the defendant testified credibly that she has a "much better" relationship with her daughter than before her August 2001 arrest when her daughter lived with her. The defendant stated that she communicates with her daughter over the telephone. She stated that she helps her daughter with homework via telephone.

51. The defendant testified credibly that before her August 2001 arrest she "had a no care attitude" concerning her job.

52. She testified credibly that after her arrest in August 2001 she tried harder to fulfill her maternal obligations to her daughter.

53. The defendant also testified credibly that after her arrest, she had a better attitude towards work and tried to expand her employment skills.

54. The defendant testified credibly that because of the time she spends at work and talking to her daughter on the telephone, she has not been socially "out in the past two months" and has not been to a movie in "a year or so."

55. She testified that she married the father of her daughter in December 2004, while he

was incarcerated. He has a substantial criminal history, including his current conviction for what the defendant described as "attempted murder." She testified credibly that the marriage resulted in her daughter's closer relationship with the father by way of prison phone calls. The defendant stated that the incarcerated father also helps with the daughter's homework via prison phone.

56. The defendant stated credibly that she now participates in organizing community block parties, whereas before her arrest, she would not have done so.

57. During cross-examination, before being confronted with copies of her unemployment insurance benefit checks, the defendant stated that while she was employed by Skyline Credit Ride she had no need for public assistance, because she was gainfully employed.

58. Before the defendant was confronted with copies of her unemployment insurance checks, she claimed that she informed the Department of Labor that she was employed before the agency discovered her fraud:

Q. You were certifying you were not employed, weren't you?

A. I did inform them I was employed after a while.

Q. After you cashed the checks, after they found out you were employed, is that correct?

A. No, this was before.

Q. You're under oath.

A. This is before I did speak to someone.

Q. Isn't it true you cashed approximately $6,000 of unemployment insurance during that time period?

A. We're still resolving that right now.

Q. Are you telling the Court that you told New York State

Department of Labor that you were employed during that
period of time?

A. I did tell them, the $6,000 we're still handling that right now.

Q. During the period of time you were cashing the checks,
you're saying you told them you were employed, [and] still
cashed these checks? Are you telling the Court that?

A. In the beginning, no.

Q. In the beginning, meaning for a whole year when you
cashed the checks isn't that correct?

A. I only got unemployment for a year.

59. The defendant admitted that she committed insurance fraud after her arrest in this

case:

Q. You were trying to give the Court a sort of before and after snapshot of you, an idea
[of] what you were like before you were arrested in August 2001 as opposed
to what you're like after?

A. Yes.

Q. I think the words you used were before you were arrested, you had like "a don't-care
attitude." Would that be correct?

A. Yes.

Q. Here you're cashing, falsely claiming to the Department of Labor you're
unemployed, cashing these checks, insurance fraud. What were you convicted of before
August, 2001? Insurance fraud?

A. Yes.

Q. What are you doing now after 2001 by cashing these checks, falsely claiming you're
unemployed, insurance fraud?

A. I guess so, I'm not sure.

60. The defendant testified, but was on this point not credible, that she did not know

unemployment insurance fraud was a serious offense:

> Q. Directing your attention to the sentencing proceeding
> of September 15th, 2003, didn't you tell Judge Weinstein that you learned your lesson
> from your underlying insurance fraud conviction?
>
> A. Yes, I did.
>
> Q. But you hadn't learned your lesson, had you?
>
> A. I didn't know, to be honest with you, to be honest
> right now, that it was serious like that: that
> the unemployment was serious like that. I didn't
> really know –
>
> Q. You didn't know it's a serious offense?
>
> A. No. I didn't.
>
> Q. But you knew it was an offense?
>
> A. I didn't know how serious it was. I didn't know.

61. By January 2005, the defendant was in arrears for her court-ordered restitution

payments of sixty dollars per month.

62. From January 21, 2005 until June 21, 2005, the defendant did not make any of her

court-ordered monthly restitution payments.

63. On January 24, 2005, the defendant cashed a $3,926.00 federal income tax refund

check.

64. The defendant did not report her receipt of the $3,926.00 tax refund on her January

2005 Probation Monthly Supervision Report.

65. Defendant was raised in a dysfunctional family. Her father was an alcoholic and a

criminal who used his position of power in the household to pressure other members into illegal

conduct. Throughout much of the time relevant to this matter the defendant lacked the financial resources to live independently of her family, and continued to live with them despite her continuing reservations about doing so. It was the defendant's father who organized the massive criminal fraud that was the subject of the indictment; he encouraged and directed the defendant and other family members to become involved.

66. Defendant dropped out of high school in 1992, while she was still in the eleventh grade, following an attack by a twenty-five year old stranger who threw acid on her face. This attack caused extensive facial scarring that is still visible in the form of welts across her face and neck. She was reluctant to be seen in public for a year following this attack, which was a contributing factor to her leaving school. Even before the attack, the defendant, according to her own testimony, was an indifferent student who was frequently absent from school in order to socialize with her friends. She enrolled in a GED program at the Interboro Institute but did not finish her course of study. A New York Times article dated July 12, 2005 reported that only 14 percent of Interboro's students actually graduate despite a rising tuition that is largely covered by various public assistance programs. Karen W. Arenson, *Speedy Growth in Career Schools Raises Questions*, N.Y. TIMES, July 12, 2005, at A1.

67. Defendant entered into a sexual relationship that led to the out-of-wedlock birth of her daughter, Quentaya, in 1995, when defendant was 19 years old. Quentaya's father was incarcerated in 1996 and remains in prison. Defendant was a single mother, with no high school diploma, who had the responsibility of acting as the principal source of financial and parental support to her daughter. Prior to her arrest in the instant case she failed to effectively discharge either of those duties.

68. Defendant was marginally employed in 1999, reporting only $260.00 in income for that year. She was otherwise supported by public assistance and by her family. She spent most of her time just "hanging out." It was during November of that year that defendant was induced by her father to participate in the staged automobile accident that was the subject of her guilty plea.

69. In 2000, defendant earned slightly over $9,000.00 as an entry level clerical employee at a law firm. She was terminated after only nine months because of poor attendance. While some of her absences from work had been caused by Quentaya's illness with asthma, a larger factor was defendant's poor attitude at work and an irresponsible social life that kept her out late at night partying with friends while her mother tried to care for Quentaya. Poor attendance was the most significant cause of defendant's losing this job. She had made no consistent commitment to doing anything more than minimally performing her duties as an employee.

70. The next job that defendant obtained, in 2001, was as a teller at Lefta Check Cashing, a small business located in her neighborhood. It was her responsibility to cash checks presented at the business in accordance with procedures that had been communicated to her. She failed at this job, as already noted.

71. Defendant's inability and refusal to act as a good parent was a contributing factor to the severity of Quentaya's asthma. Defendant admitted that if her daughter, when she was a mere toddler, would cry, she would respond by yelling at her. During this period the defendant had no permanent relationship either with the father of her child or with any other partner that could have assisted her emotionally or materially in providing a stable environment for her daughter. Defendant was then providing completely inadequate assistance to her daughter as Quentaya

prepared for and then entered elementary school.

72. In the summer of 2001 defendant moved to Maryland where her only serious social contact was a 24-year-old friend who was a single mother of three living in a three-bedroom apartment. Defendant had not carefully planned the move, although her motive to do so was a positive one. She felt herself surrounded by friends who "was just doing nothing." That was also a fair characterization of what she was doing with her own life. The defendant was arrested on the instant case in August, 2001, while living in Baltimore.

73. In summary, during the period before rehabilitation defendant was negligent in her maternal responsibilities, her employment history was at best checkered, and she was not making any progress toward strengthening her employment skills. She led an irresponsible social life which contributed to her difficulty in obtaining and holding on to steady work. She was overly dependent on her dysfunctional family and accepted financial support from her criminal father, who was able to provide money only because he was engaged in criminal activities. Her mother was unable or unwilling to work, and, following the arrest of the defendant's father, has suffered from various medical ailments including hypertension.

74. Defendant was released from custody following her arrest in Baltimore and has remained at liberty. She has been under the supervision of either the Pretrial Services Agency or the Department of Probation of the Eastern District of New York. Defendant's progress has not been perfect. There have been serious setbacks, but this phenomenon is not unusual. *See, e.g., United States v. Kane*, 88 F. Supp. 2d 408, 412-13 (E.D. Pa. 2000) ("The court is not blind to the significant problems still facing [defendant] or to the less commendable aspects of [defendant's] behavior during . . . release pending sentencing. . . . . These lapses, while significant, must be

viewed in the context of [defendant's] former behavior. . . . While the court fully acknowledges the seriousness of [defendant's] errors, it concludes that they do not preclude a departure . . . ."). In the instant case, defendant's overall progress from a baseline established at the time of her arrest, taking into account all areas of life that affect her, her daughter and her community, can be characterized as revealing "extraordinary rehabilitation."

75. Defendant returned to work at Lefta in September and October of 2001. She was fired after one month for conduct that was irresponsible and, possibly, criminal.

76. Defendant gained new employment at the end of 2001 as a monitor of surveillance video screens for a firm that provided internal security for a housing project in the Bronx, the Beekman Houses. *Cf.* KOZOL, *supra*, at 61 ("[T]hree blocks from the park i[s] one of the 1,273 apartments of the 38 buildings of the privately owned but publicly subsidized Diego-Beekman Houses, a complex of some of the most physically repellent and profoundly dangerous buildings in America . . . ."). Her performance on this job was better than during her previous employment. Her attitude toward her work was markedly improved and she was far more restrained in her social life. When defendant's supervisor left the company Ms. Hawkins was assigned to replace her. During this period defendant was also more attentive to her daughter's needs. She was behaving more responsibly in her domestic life just as she was doing at her place of employment. Defendant lived with her mother and brother at this time and contributed to the household expenses, as she continues to do.

77. Defendant lost her job with the security firm in August, 2002, when a superior learned of the pendency of the instant felony criminal prosecution. She applied for unemployment compensation after her dismissal. She was granted unemployment payments of

$179.10 a week, beginning on October 13, 2002. As already noted, she illegally continued to receive unemployment payments after she started a new job. The New York State Department of Labor subsequently received partial compensation by seizing $1,624.00 in State income tax refunds that defendant would otherwise have received. The State maintains a lien against future tax refunds to which the defendant would otherwise be entitled. Her future tax refunds will be used to pay back to the state the money defendant owes it.

78. The employment defendant took in November, 2002, was with a car service company, Skyline Credit Rides. She has retained that job until the present. She is a dispatcher. Dispatching in New York City is a difficult trade. It involves constant pressure to get cars where they are supposed to be, to deal with clients who often feel aggrieved, and to keep track of an enormous amount of information as moving vehicles are picking up and dropping off passengers all over the city. It requires a high degree of skill in computer technology and in the ability to handle peers, superiors, inferiors and the general public. Defendant has significantly improved her computer skills and has learned how to use the internet. Her performance in her present position reflects not only hard work but a new attitude toward her employment, one in which she seeks to excel rather than to merely get by with minimal effort.

79. The findings regarding the transformation that the defendant has exhibited in her efforts to maintain meaningful employment are confirmed by the fact that as of June, 2005, she assumed a second position as a dispatcher. She works, at a 50% premium to her regular hourly wage, as a dispatcher for livery cars servicing the sizable New York office of a major international law firm. Defendant had to be interviewed and evaluated before she was given this job, which entails all of the previously noted complexities. The second job requires an extra 25

hours per week above her regular, full-time job with Skyline Credit Rides. The income from this second job has been used by defendant to begin to pay arrearages in her restitution obligations as required by her original sentence. This extra income will also increase her ability to repay the New York State Department of Labor from tax refunds.

80. The fact that an individual of defendant's background and prior skill level attained this extra employment, and that she faithfully and competently discharged her duties, is confirmation of an "extraordinary" transformation from the indifferent attitude she exhibited prior to her arrest. It is also evidence of her mastery of a broad array of employment skills that will be available to her in the future if her employment is not terminated by incarceration.

81. Defendant's transformation is not limited to her employment skills. She has done what was reasonably within her power to normalize her daughter's life. She married the father of her daughter, even though he remains in prison. This has provided her daughter with a stronger sense of identity and as solid a relationship with her father as circumstances permit. Defendant sent her daughter to live with her mother-in-law in Harrisburg, Pennsylvania, because she will have a more stable home life there, considering the fact that defendant is now working over 60 hours a week. Defendant has exhibited a more mature and supportive relationship with her daughter. She has increased her expectations for her daughter and calls her daughter nightly to provide assistance in homework assignments and guidance in daily life. Defendant also contributes substantial financial assistance to her daughter, both in direct payments for necessities such as clothing and through compensation to her mother-in-law. Defendant has also become involved in community activities in a positive way. She has abandoned negative socializing, and has largely devoted herself to her work and to her daughter. She avoids making

all but essential expenditures on herself. She pays rent to her mother and is now a provider where she was formerly a dependent.

82. The fact that defendant falsely certified that she was unemployed and cashed over $6,000.00 in checks to which she was not entitled is a serious matter. There is no indication that the defendant planned to defraud the Department of Labor, although she knowingly abused the circumstances that developed when checks continued to arrive after she gained new employment. Defendant's relative naiveté is demonstrated by the fact that she cashed both her paycheck and her unemployment check at Lefta Check Cashing, and that she used her actual Social Security number both with the Department of Labor and Skyline Credit Rides.

83. Although they are inexcusable, the defendant's transgressions do not negate the progress that she had made by the time of her original sentence and which she has continued up to the present. When an individual is emerging from troubled or criminal circumstances, back-sliding is not an uncommon occurrence. Defendant's progress in the more than two years since she ceased receiving unemployment checks confirms that this episode was atypical of the person that she was then becoming and has now become.

B. Conclusions of Law

84. The legal standard to justify a downward departure based on "extraordinary rehabilitation" is exacting, requiring the defendant to overcome the presumption that "the defendant's circumstances are not so unusual as to justify departure." *United States v. Bryson*, 163 F. 3d 742, 748 (2d Cir. 1998) (internal quotations and citation omitted).

85. The rationale for the departure is that the defendant's rehabilitation lessens the likelihood of recidivism. Rehabilitation is put in doubt where defendant continues to engage in

60

criminal activity. *See, e.g., United States v. Herman*, 172 F.3d 205, 209 (2d Cir. 1999) (finding that alleged rehabilitated drug addict who continued to commit crimes during his rehabilitation from drugs was "merely a rehabilitated drug addict, not a rehabilitated criminal" and the rationale for the rehabilitation departure "obviously fails where the rehabilitated drug abuser continues to commit crimes"). *But see id.* at 208 ("In determining whether a defendant's rehabilitative efforts have been sufficiently extraordinary to warrant a downward departure, a sentencing court must make a refined assessment of the many facts bearing on the outcome, informed by its vantage point and day-to-day experience in criminal sentencing. So long as that 'refined assessment' has occurred, this Court will not disturb a sentencing court's decision to depart unless the factual findings underlying that decision are clearly erroneous.") (internal quotations omitted).

86. Extraordinary rehabilitation is demonstrated by the degree to which rehabilitation has transformed a person from a starting point established at the time the offense conduct was committed to the time of the imposition of a sentence. *United States v. Middleton*, 325 F.3d 386, 389 (2d Cir. 2003). While the starting point in this case remains constant, the time of sentence is, given the circumstances and terms of the remand, subject to some interpretation. It could be the time of the original sentence or the time of resentence following remand from the Court of Appeals. The result under the facts would be the same – a finding of extraordinary rehabilitation.

87. Clear and convincing evidence establishes that defendant exhibited extraordinary rehabilitation both at the time of the original sentence (based on information then available) and at the time her sentence was reconsidered after remand. After sentence, her extraordinary rehabilitation continued despite a serious crime against the state unemployment compensation funds.

88. A non-Guideline sentence in the instant case is required based on the sentencing criteria in section 3553(a) of title 18 of the United States Code and the authority of *Booker* and *Crosby*.

89. The sentence originally imposed comports with application of section 3553(a). An analysis of each of the section 3553 criteria supports such a sentence.

90. The sentence of probation originally imposed is sufficient, but not greater than necessary, to comply with the purposes set forth in section 3553(a)(2). The offense was serious but the defendant was involved in limited aspects of the criminal acts that were committed in the charged conspiracy. The sentence imposed adequately reflects the seriousness of defendant's individual role. Other defendants with greater involvement have received harsher punishment. The interests of general deterrence are adequately served without imposing a prison sentence on this defendant.

91. The public is better protected from future criminal activity of this defendant by imposition of a sentence of probation. Such a sentence preserves the employability of this defendant, a circumstance that provides the surest protection against recidivism in this case. Were the defendant to be incarcerated, her future employability would be seriously compromised. This would not only create a financial liability on the public, it would remove the defendant from her present circumstances, where she has a unique opportunity to observe law-abiding conduct. A sentence of incarceration would, both during and after the period of imprisonment, place the defendant in her former environment where, as she aptly observed, her associates were engaged in no productive activity and in substantial antisocial conduct.

92. The maximum sentence within the Guideline range would result in a period of

incapacitation of only 18 months. Subsequent to that period the defendant would pose a greater

risk to the public because the chances of recidivism would probably increase. The hazards to the

public of those released from prison are well-known. *See, e.g.*, *United States v. Blake*, 89 F.

Supp. 2d 328, 344 (E.D.N.Y. 2000) ("Instead of reforming its inmates, too often a prison

converts them into 'hardened enem[ies] of society'") (quoting H.L.A. HART, PUNISHMENT AND

RESPONSIBILITY 25-27 (1968)); Kate Zernike, *In Illinois, Kicking Drugs (And the Prison Habit)*,

N.Y. TIMES, June 26, 2005, § 1, at 16 ("Andre Willis started selling cocaine and heroin when he

was 14, and by 25 had been sent to prison four times. Each time he got out he vowed to look for

an honest job. But employers did not want to hire an ex-convict, so he would give up after two

months and go back to selling drugs and smoking marijuana."). Maintaining the present sentence

holds the greatest promise of long-term protection of the public against future criminal activity

by the defendant.

93. The defendant's conduct over the last two years demonstrates that the constraints

imposed by her determination to succeed in her employment have guided her to a law-abiding

lifestyle. Permitting defendant to continue on her present course is the best guarantee that her

daughter will conform to the defendant's present standards of conduct rather than take up the

lifestyle of her maternal grandparents and her father.

94. The defendant's educational and vocational training needs are best served by

permitting her to maintain continuity in her present employment or such equivalent employment

as she may secure in the future. Defendant has demonstrated that she has acquired significant

skills on the computer, including the ability to use the internet. She has learned important basic

employment skills such as promptness, reliability, and initiative, which were borne out when she

was selected to serve as a dispatcher for the local office of a major international law firm. It would be advisable for the defendant to acquire additional educational credentials such as a G.E.D. certificate, and she has expressed a desire to do so. Her inability to achieve a G.E.D. certificate to date does not diminish the significance of the employment skills that she has acquired on her own and through her present employment. The court's Probation Service will assist defendant in obtaining a G.E.D. certificate.

95. Consideration of the kinds of sentences available and of the sentencing range established for the charged offense under the Sentencing Guidelines, including all pertinent policy statements, supports restoring the sentence of probation and restitution previously imposed. An alternative sentence involving any period of incarceration would be as damaging as a sentence of straight incarceration.

96. The sentence of probation that the defendant received is proportionate to those of other defendants with similar records who have been found guilty of similar conduct in this case. Approximately one quarter of the original defendants received a sentence of probation. Many of those sentences were for a shorter period than that imposed on this defendant.

97. The need to provide restitution to victims of the offense is best served by maintaining the defendant's present employment status. The second job she has obtained has enabled defendant to begin to catch up on arrearages in payments of restitution. Incarceration, followed by a period of diminished employability, would impinge on the defendant's ability to make future restitution payments. This conclusion applies to the defendant's ability to repay the New York State Department of Labor through income tax refunds.

98. Section 5K2.19 of the Guidelines, which proscribes consideration of post-sentencing

rehabilitation following a sentence of imprisonment is not applicable. By its terms that

Guideline provision is limited to situations where the original sentence involved a term of

imprisonment. *See* U.S.S.G. § 5K2.19 ("Post-sentencing rehabilitative efforts, even if

exceptional, undertaken by a defendant *after imposition of a term of imprisonment* for the instant

offense are not an appropriate basis for a downward departure when resentencing the defendant

for that offense.") (emphasis added). Because a sentence of probation was originally imposed in

this case, section 5K2.19 does not apply. The court has found no support in the caselaw for the

government's claim to the contrary.

99. Incarceration of the defendant would have a disastrous effect on her daughter, a

matter of importance in sentencing jurisprudence.

### VI. Conclusion

The sentence previously imposed best reflects the nature and circumstances of the

offense and the history and characteristics of the defendant. The facts and the law support

this sentence. It is reimposed without change, with credit for time already served on

probation. The defendant has shown extraordinary rehabilitation; a probationary term

best satisfies section 3553 of title 18 of the United States Code.

SO ORDERED.

Jack B. Weinstein
Senior U.S.D.J.

Dated: August 8, 2005
       Brooklyn, New York